UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GRETCHEN STITES-CUNNINGHAM,
individually and as Guardian
ad Litem for ASHLEY STITES,
a minor,

                                  NO. CIV. S-09-590 LKK/DAD

    Plaintiffs,

  v.

AQUA LEISURE INDUSTRIES, INC.,           O R D E R
WAL-MART STORES, INC., THE
UNITED STATES OF AMERICA,
and DOES 1-50,

    Defendants.
                                     /
AND RELATED CROSS-ACTIONS
                                     /

    Plaintiff Gretchen Stites-Cunningham, as guardian ad litem for minor Ashley Stites, brings claims regarding a snow tubing accident that left Ashley a paraplegic.[1] Plaintiff initially named as

---

[1] Gretchen Stites-Cunningham previously brought claims in her individual capacity as well, but these claims have been abandoned. (Dkt. No. 29.)

1

defendants Aqua Leisure Industries, Inc., the manufacturer of the tube used during the accident, and Wal-Mart Stores, Inc., the vendor who sold the tube. Aqua Leisure and Wal-Mart then filed a third party complaint seeking indemnity and contribution from the United States, the owner of the land where the accident occurred. Plaintiff have since amended the complaint to allege that the United States was directly liable, and Wal-Mart has dismissed its claim against the United States. Thus, what remains are plaintiff's claims against all three defendants, and Aqua Leisure's claim against the United States.

Plaintiff and the United States have entered a proposed settlement agreement. In connection with this agreement, the United States has filed a motion for a good faith settlement determination, which if granted would bar Aqua Leisure's claim against the United States. Aqua Leisure opposes this motion.[2] Plaintiff has also filed separate motions for approval of a minor's compromise and to remand the remaining issues to state court. These latter motions are unopposed. The court resolves all three motions on the papers and after oral argument. For the reasons stated below, the motions are granted.

---

[2] The opposition is styled as being on behalf of both Aqua Leisure and Wal-Mart. Insofar as Wal-Mart has dismissed its claim for contribution or indemnification, it appears that Wal-Mart has little ground for opposing the motion for a good faith settlement determination. Whether or not Wal-Mart opposes the motion does not change the good faith analysis in this particular case. For convenience, the court refers to the opposition as being filed solely on behalf of Aqua Leisure.

# I. Background[3]

**A.    The Subject Accident**

The accident underlying this suit occurred on January 6, 2007. Ashley Stites ("Stites"), who was thirteen years old at the time, had received a snow tube from her grandmother Roberta Rich as a Christmas present. This tube was manufactured by Aqua Leisure and purchased from Wal-Mart. Warning labels were printed on the snow tube and box, which specified that the tube did not have any steering or braking mechanisms. On January 6, 2007, Roberta Rich took Stites (Rich's granddaughter) and twelve-year-old P. Rich (Stites's aunt and Rich's daughter) to go snow tubing.[4] Stites had never used a snow tube before.

The group went to Eskimo Hill, a no-fee snow play area within Lassen National Forest. Eskimo Hill features a sloped sledding hill that is between 150 and 200 yards long, with slopes ranging from 23 degrees at the top to 10 degrees at the bottom. At the bottom of this hill is a man-made depression referred to as the "bowl." On the side of the bowl opposite the hill is a man-made earthen berm with a lip which extends 8 to 10 feet above the bottom

---

[3] These facts are taken from the United States' motion for a good faith settlement determination and from Aqua Leisure's opposition thereto. The court discusses these facts for purposes of these motions only, and does not make any determinations of facts for purposes of future proceedings.

[4] The United States refers to Rich's daughter as Ashley Stites's aunt. This term is correct, but it may suggest that Ashley was supervised by two adults. Although the degree of adult supervision is not pertinent to the resolution of the pending motions, the court notes that Ashley Stites is older than her aunt.

3

of the bowl. Beyond this lip is a flat spectators' area which extends for approximately ten yards until the treeline. Beyond the treeline was the boulder Stites ultimately struck.

When the group arrived at Eskimo Hill, they walked past several warning signs. Roberta Rich read one of these signs and told plaintiff to be careful. Stites watched several people sled down the hill and stop in the bowl. Without doing any trial runs or other testing of the tube, she and her aunt climbed to the highest point on the hill and got on the tube together. The two went down the hill without taking any action to steer or slow the tube. The tube did not stop in the bowl. Instead, it went over the berm and lip, through the spectators' area, and past the treeline. The tube stopped when it hit a boulder within the forested area. Stites also hit the boulder and sustained the serious injuries noted above. Although the complaint alleges that this boulder was placed by the Forest Service, the parties now agree that this allegation is incorrect, and that the boulder was naturally occurring.

As a result of the accident, significant medical expenses accrued. According to her Fed. R. Civ. P. 26 disclosures, Stites has incurred current medical expenses of $484,957.34, estimated future medical expenses of $2,490,502, future lost wages of $815,360.00, and general damages of $10,000,000.[5]

---

[5] In opposing this motion, Aqua Leisure states that plaintiff has incurred $300,000 in present medical expenses and anticipates $3,000,000 in future medical expenses. Because the disparity between these figures and the Rule 26 disclosures does not impact

4

**B.   History of Management of The Eskimo Hill Area**

Eskimo Hill has been used as a snow play area for more than 80 years, beginning in the 1930s when the Civilian Conservation Corps cleared the northeast slope of Eskimo Hill for its own winter recreation use.

In July of 1970, the United States Forest Service considered a proposal for commercial development of Eskimo Hill.  The Forest Service noted that one proposal for commercial development, which involved lengthening and effectively steepening the sledding run, would risk "excessive velocities and injuries."  Letter of July 13, 1970, document Bates stamped U.S. 1096.[6]  For reasons not discussed by the parties in this suit, commercial development and accompanying slope modifications were rejected.  In an August 1980 publication, the Forest Service stated that high use of the area had lead to "an increasing number of accidents."  U.S. 1109.  This publication noted that in response to this issue, "[t]he slope was shortened to reduce the speed of descent, groomed to remove risky jumps, modified to provide a children's area and so constructed to keep vehicles out of the toe of the slope."  U.S. 1110.  Neither the 1970 nor the 1980 document refer to any incidents of "overshooting" the stopping area at Eskimo Hill, or to any risk thereof under the facility's configuration at that time.

---

the court's analysis, the court does not inquire as to the disparity's source.

[6] For the remainder of this order, the court uses the format "U.S. XXXX" to refer to exhibits identified by Bates stamp numbers.

5

In 1994, the Forest Service considered another a proposal to expand the Eskimo Hill area. The Forest Service conducted an Environmental Assessment of the proposal pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. After this assessment, the Forest Service selected the option of "rehabilitation and expansion of facilities at Eskimo Hill," including increasing parking capacity and improving access to the hill from the parking area, design improvements for restroom facilities, and hill expansion. Decision Notice and Finding of No Significant Impact, U.S. 0029. However, there was insufficient funding to implement this decision. Id. Thus, the Forest Service did not expand the sledding hill itself, although it did lengthen the run-out area so that the hill was less steep, create a larger area for sledders to stop, and deepen and further define the bowl, berm, and lip.

In connection with the environmental assessment, the consultant hired by the Forest Service discussed the possibility of adding a "manzanita crash cushion to prevent sliders from entering congregating areas or the trees." Decl. of Eunice C. Majam ISO Aqua Leisure's Opp'n, ¶ 5 and Ex. D, p. 2, ¶ 4. The manzanita cushion was not discussed in the environmental assessment itself. This manzanita cushion was never constructed. The United States maintains that this manzanita planting was merely a component of the proposal to widen the sledding area, and therefore superfluous absent such widening. Reply at 2. The documents cited by the United States, however, do not explicitly discuss the manzanita,

and they do not explicitly connect the berm with the proposed hill expansion.

Aqua Leisure contends that Eskimo Hill has a history of ice forming on the bowl area. The evidence indicates that in one spring after the accident occurred, the Forest Service was concerned about melting snow creating a frozen pond in the bowl area. No evidence indicates that this problem has ever occurred during the sledding season, that it occurred the year of the accident, or that it has recurred.

**C.  Procedural History**

Ashley Stites's mother, Gretchen Stites-Cunningham, filed suit in state court on June 26, 2007, in her individual capacity and as guardian ad litem for Ashley Stites. The initial state court complaint named Aqua Leisure and Wal-Mart as defendants, under theories of negligence, products liability, strict liability, breach of warranty, negligent design and inadequate warnings. On September 22, 2008, Aqua Leisure and Wal-Mart filed a motion seeking permission to file a third party complaint against the United States, seeking indemnity and contribution. This motion was granted, and on March 2, 2009, the United States removed the matter to federal court. Aqua Leisure and Wal-Mart then filed an amended third party complaint, and plaintiff subsequently filed an amended complaint, naming the United States as a defendant.[7] Wal-Mart has

---

[7] Because the United States is now named as a defendant in plaintiff's complaint, Aqua Leisure's third party complaint might now be more properly called a cross complaint.

7

since dismissed its claims against the United States, and Gretchen Stites-Cunningham has dismissed all claims brought by her in an individual capacity.

## II. Good Faith Settlement

The United States has proposed to settle plaintiff's claims against it for $25,000. The parties agree that if this settlement is in good faith, settlement will bar Aqua Leisure's claims for contribution and indemnity.

**A.  Good Faith Settlement under Cal. Civ. Code §§ 877 & 877.6**

Section 877 of the California Code of Civil Procedure provides, in pertinent part:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater.
>
> (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties.

Section 877.6 provides a procedure for the application of this rule, subsection (c) of which provides that settlement discharges liability for indemnity as well as contribution:

8

> A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.

Both Section 877 and the indemnity provision of Section 877.6(c) are substantive rules applicable to state law claims brought in federal court. Federal Savings & Loan Ins. Corp. v. Butler, 904 F.2d 505, 511, 511 n.6 (9th Cir. 1990). To the extent that the remaining provisions of Section 877.6(c) are procedural and not binding in federal courts, district courts are free to determine good faith through an analogous procedure. Id. at 511; see also Slottow v. American Casualty Co., 10 F.3d 1355, 1358 (9th Cir. 1993).

These provisions apply to the plaintiff's claims here. Plaintiff's claim against the United States arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674. FTCA actions are governed by the substantive law of the state in which the "act or omission occurred." Delta Sav. Bank v. United States, 265 F. 3d 1017, 1025 (9th Cir. 2001). In accordance with this rule, the Ninth Circuit has applied Section 877 to settlement of claims arising under the FTCA. Owen v. United States, 713 F.2d 1461, 1462 (9th Cir. 1983). Aqua Leisure does not dispute that Section 877 applies here.

The "good faith" determination under Section 877 is based on the factors identified in the California Supreme Court's decision

9

in Tech-Bilt, Inc v. Woodward-Clyde & Associates, 38 Cal.3d 488, 499-500 (1985). These factors include: (i) a rough approximation of plaintiff's total recovery and the settler's proportionate liability; (ii) the amount paid in settlement; (iii) a recognition that a settler should pay less in settlement than if found liable after trial; (iv) the allocation of the settlement proceeds; (v) the settling party's financial condition and the availability of insurance; and (vi) evidence of any collusion, fraud, or tortious conduct between the settler and the plaintiff aimed at requiring the non-settling parties pay more than their fair share. In this analysis, "practical considerations obviously require[] that the evaluation be made on the basis of information available at the time of the settlement. A defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." Id.

**B. Reasonable Approximation of Liability**

Tech-Bilt requires that the court consider a "rough approximation" of "the settling defendant's liability." 38 Cal.3d at 499-500. Aqua Leisure argues that this requires, at the least, a discussion of the amount of claimed damages. The United States contends that where a defense precludes a judgment in plaintiffs' favor, the amount of damages claimed is irrelevant. Thus, the United States implicitly invokes a simplistic 'amount of damages times likelihood of recovery' method for valuing claims, together
////

with the principle that the product of any amount and zero is zero.[8] According to the United States, it has no potential liability to plaintiff, and the $25,000 offered in settlement merely represents the amount the United States saves by avoiding the burden of proving its defenses.

Insofar as Aqua Leisure argues that the United States has not met its burden of production, the court declines to deny the motion merely on the ground that the United States' opening memorandum did not explicitly discuss plaintiff's claimed damages. Plaintiff's precise demands were known to all parties, so this omission did not prejudice Aqua Leisure. Additionally, the United States described the extent of Stites's injuries, making it clear to the court that damages at issue would be high.

Moving beyond the question of the burden of production, Aqua Leisure's primary argument is that the $25,000 settlement is unreasonable. Where the claimed damages are high, even a small chance of success on the merits is non-negligible. Here, as noted above, plaintiffs' Fed. R. Civ. P. 26(a)(1) disclosure claims current medical expenses of $484,957.34, estimated future medical expenses of $2,490,502, future lost wages of $815,360.00, and general damages of $10,000,000. At the time of the initial disclosures, plaintiffs therefore sought $13,790,819.34. Under the

---

[8] Aside from asserting affirmative defenses, the United States also argues that the evidence does not support some of the allegations underlying plaintiffs' claims. Notably, plaintiff alleged that the United States placed the boulder in question on site, but the evidence has revealed that the boulder's placement was natural.

11

simplistic valuation method given above, if plaintiffs have, for example, even a one or two percent chance of succeeding in proving entitlement to these damages from the United States, the expected value of their claim is roughly $140,000 or $280,000, less litigation expenses.

This leaves both Aqua Leisure and the United States in curious positions. Aqua Leisure ultimately contends that plaintiff's claims against all parties are barred by the assumption of risk doctrine. Aqua Leisure and the United States further agree that they are similarly situated with respect to this defense. This leaves Aqua Leisure with a difficult decision. To show that the settlement is unreasonable, Aqua Leisure must contend that the settlement underestimates plaintiff's likelihood of recovery. Aqua Leisure's objections therefore implicitly commit it to the position that the assumption of risk defense has an appreciable likelihood of failing. If Aqua Leisure were to identify any frailties with the assumption of risk defense, however, Aqua Leisure might jeopardize its own ability to invoke the defense in subsequent proceedings. Presumably concluding that the latter is the greater evil, Aqua Leisure has chosen not to address the United States' argument that the assumption of risk defense is independently sufficient to eliminate the United States' potential liability. The court notes that plaintiff has not conceded that the assumption of risk doctrine bars the claims.

The United States' position is also curious. Because the United States has not challenged plaintiff's damages calculation,

the United States essentially asks the court to determine that a reasonable person would conclude that the United States' defenses have in aggregate much less than a one percent chance of failing. The United States has not, however, actually asked the court to rule on the applicability of its defenses. Nonetheless, the United States has submitted a statement of disputed facts and supporting exhibits and affidavits in connection with the instant motion which satisfy the local rules and the requirements of Fed. R. Civ. P. 56(e).

Despite the oddity of both Aqua Leisure's and the United States' positions, the substantive legal question involved is not difficult. As explained below, the United States has made a sufficient showing that claims against it are barred by California's Recreational Use Act. Because the court concludes that the showing as to this defense is sufficient to render the settlement a reasonable approximation of the United States' liability (at most), the court need not examine the United States' other defenses, i.e., the assumption of risk doctrine and the discretionary judgment rule.[9]

---

[9] The FTCA's discretionary judgment rule is a sovereign immunity defense, and therefore jurisdictional. A federal court must confirm that it has subject matter jurisdiction before addressing non-jurisdictional issues. Immunity defenses, however, must be affirmatively invoked; thus, a court has subject matter jurisdiction until a defendant invokes its immunity. Insofar as the United States merely argues that a discretionary judgment defense would likely succeed without actually moving for dismissal on this ground, the court has subject matter jurisdiction over claims against the United States. The court may therefore consider California's Recreational Use Act without addressing the discretionary judgment rule.

13

California Civil Code section 846 provides landowners with immunity from actions arising from recreational use of their property. The United States may invoke this state law defense in FTCA actions. Termini v. United States, 963 F.2d 1264, 1266 (9th Cir. 1992) (citing Carlson v. Green, 446 U.S. 14, 23 (1980)). The United States and Aqua Leisure agree that in this case, this statute immunizes the United States unless the United States was "willful or malicious [in failing] to guard or warn against a dangerous condition, use, structure, or activity." Cal. Civ. Code § 846(a).[10] In this context, misconduct is willful only where defendant had "(1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) [a] conscious failure to act to avoid the peril." Termini, 963 F.2d at 1267, Spires v. United States, 805 F.2d 832, 834 (9th Cir. 1986).[11]

Aqua Leisure argues that this case is factually analogous to Termini, where the Recreational Use statute did not immunize the United States from liability where a Forest Service road ended in

---

[10] Thus, the United States and Aqua Leisure agree that plaintiff was engaged in recreational activity within the meaning of this provision, and that the other two exceptions to the immunity provision do not apply here.

[11] Whether the California statute applies to FTCA claims is plainly a question of federal law. The subsequent question of interpretation of the California statute appears to be a question of state, rather than federal, law. Both Aqua Leisure and the United States nonetheless solely rely on federal cases interpreting the California statute, the most recent of which is Tremini, decided in 1992.

14

an abrupt cliff, which a driver accidentally drove over. 963 F.2d at 1261. In discussing the first willfulness element, the Termini court held that "Common sense dictates that a precipice at the end of a road constitutes a peril to be apprehended. It is equally clear that the United States possessed actual knowledge of this peril. It does not deny that the USFS built and maintained the spur that ends literally at the cliff's edge." Id. at 1267. Here, nothing indicates that the United States had actual or constructive knowledge of the danger posed by the boulder in question, or by other boulders present, if any. If the inquiry is broadened to consider the danger of overshooting the sledding area, the United States knew of this danger in the abstract, although nothing indicates that the United States knew that Eskimo Hill, as configured at the time of the accident, presented this danger. Thus, the court doubts that the United States had knowledge of the peril within the meaning of California's Recreational Use Act. Nonetheless, because the other elements of willfulness are unsatisfied, further discussion of this issue is unnecessary, and the court assumes that the United States knew that overshooting was a danger.

As to the second willfulness element, in Termini, "the United States should . . . have known that sooner or later an accident would occur if it did not warn or guard against the cliff's presence." Id. at 1268. This was because "The spur as designed and maintained simply [did] not account for the possibility of error, be it induced by human, mechanical or natural factors." Id.

This conclusion was further supported by the fact that the Forest Service's own safety regulations, as understood by the Ninth Circuit, required placement of a sign warning of the danger. By adopting regulations requiring a warning, the Forest Service demonstrated knowledge of the fact that the condition was dangerous. Id. The mere fact that no prior accidents had occurred did not demonstrate that such an accident was unlikely. Id. at 1269. However, neither Termini nor the California authorities cited therein concluded that the absence of prior accidents was irrelevant. Id. ("'the matter of probability is not to be assessed *solely* by the number of prior accidents, which adventitiously may have been few, but by all the circumstances.'") (quoting Lostritto v. Southern Pacific Transportation Co., 73 Cal. App. 3d 737, 140 Cal. Rptr. 905, 909 (1977)) (emphasis added).

    In this case, even assuming that the United States had actual or constructive knowledge that overshooting was a danger, there is little, if any, evidence indicating that the United States had actual or constructive knowledge that it was probable that both overshooting would occur and that injury would result. First, while Aqua Leisure argues that the United States had actual knowledge of this probability, the evidence relied upon by Aqua Leisure does not indicate that the United States ever concluded that overshooting was likely at Eskimo Hill under an existing configuration. Second, subsequent to the 1970 and 1994 assessments, each of which discussed the possibility of overshooting in the abstract, the Forest Service took steps to make

16

overshooting less likely, such as deepening the bowl and constructing a berm. Third, in this case, the lack of prior accidents is a stronger indicator of safety than it was in Tremino. Eskimo Hill had been used by thousands of sledders over decades without an accident similar to plaintiff's. In Tremino, because the road was rarely used, the lack of accidents could more easily be attributed to a statistical fluke.[12]

As to the third willfulness factor, in light of the many proactive steps taken by the Forest Service to ensure the safety of Eskimo Hill (moving the spectators' area, deepening the bowl, constructing a berm, limiting the height of the sledding hill, removing jumps in the sledding hill, etc.), and the lack of evidence indicating the probability of injury or the United States' knowledge thereof, there appears to be no evidence to indicate that the United States "consciously failed to act to avoid the peril."

Based on the above, if the present motion were one for summary judgment, the court would be inclined to grant summary judgment to the United States, concluding that the United States was not liable to plaintiff or for contribution or indemnity to Aqua Leisure. This is not such a motion. If the court were inclined to address the issue sua sponte, thereby definitively absolving the United

---

[12] The United States further argues that willful misconduct, for purposes of California's Recreational Use Act, requires a hidden peril. While both Tremino and Spires involved hidden perils, it appears that neither case explicitly relied on the fact that these dangers were hidden from recreational users, and the United States has not provided any additional authority indicating that willful misconduct requires a hidden peril.

17

States of all liability, then at the very least, due process would require that plaintiff be provided notice of this inclination and an opportunity to argue that the Recreational Use statute does not apply. Aqua Leisure, on the other hand, has had its day in court. Despite considering Aqua Leisure's objections, the court is persuaded that the proposed $25,000 settlement is not so low as to be "out of the ballpark" of the United States' potential liability in this matter. City of Grand Terrace v. Superior Court of San Bernadino County, 192 Cal. App. 3d 1251, 1262 (1987).

**C.  Remaining Tech-Bilt Factors**

Aqua Leisure does not dispute that the remaining Tech-Bilt factors weigh in favor of a finding of good faith. Most notably, the record does not indicate "collusion, fraud, or tortious conduct aimed to injure the interest of non-settling defendants." Tech-Bilt, 698 P.2d at 166-67. Accordingly, the court concludes that the settlement is in good faith for purposes of Cal. Code Civ. P. section 877 and 877(c). The settlement therefore insulates the United States from claims for contribution or indemnity to other defendants. Because Aqua Leisure's third party claim (now a cross-party claim) is barred, the court dismisses this claim with prejudice.

### III. Approval of Minor's Compromise

Under E.D. Cal. Local Rule 202, settlement of a claim brought on behalf of a minor requires court approval. Local Rule 202(c) requires disclosure of the terms of counsel's employment, and what counsel will receive under the settlement. California law imposes

18

similar requirements.

Here, the terms of the settlement provide that the entire $25,000 will go to plaintiff's counsel, who have purportedly already incurred costs (exclusive of fees) in excess of $30,00 in this action.

As explained in the preceding section, the court finds that a reasonable person would anticipate that the United States has little, if any, liability toward plaintiff. Moreover, if the United States were to file and prevail upon a dispositive motion, the United States would be entitled to recover costs from plaintiffs under Fed. R. Civ. P. 54(d)(1). In light of these factors, the court approves the minor's compromise.

### IV. Remand

The United States removed on the basis of 28 U.S.C. § 1346, which provides for federal jurisdiction where the United States is a party. Because plaintiff's claims against the United States are hereby settled, and Aqua Leisure's claims against the United States are therefore barred, the United States is no longer a party to this action. Neither Aqua Leisure nor Wal-Mart dispute that remand is appropriate if the United States is dismissed. Accordingly, the motion for remand is granted.

### V. Conclusion

For the reasons stated above, the court ORDERS as follows:

1. The motion for approval of a minor's compromise (Dkt. No. 38) is GRANTED.
2. The Unites States' motion for good faith settlement

|   |    | determination (Dkt. No. 33) is GRANTED. |
|---|----|---|

1. determination (Dkt. No. 33) is GRANTED.
2. 3. Because the good faith settlement bars claims against the United States for indemnity or contribution, Aqua Leisure's third party complaint/cross-complaint against the United States (Dkt. No. 11) is DISMISSED WITH PREJUDICE.
3. 4. All claims against the United States having been resolved, the United States is no longer a party to this suit. Plaintiff's motion to remand (Dkt. No. 39) is therefore GRANTED. The matter is remanded to state court.

IT IS SO ORDERED.

DATED: March 10, 2010.

*/s/ Lawrence K. Karlton*
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT